Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/26/2016 02:10 PM CDT

State of Nebraska, appellee, v.
Tracy N. Parnell, appellant.
___ N.W.2d ___

Filed August 26, 2016.    No. S-15-684.

1. **Motions for Continuance: Appeal and Error.** An appellate court reviews a judge's ruling on a motion to continue for an abuse of discretion.
2. **Criminal Law: Motions for New Trial: Appeal and Error.** In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.
3. **Rules of Evidence: Other Acts: Appeal and Error.** It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2014), and the trial court's decision will not be reversed absent an abuse of discretion.
4. **Jury Instructions: Appeal and Error.** Whether a jury instruction is correct is a question of law, which an appellate court independently decides.
5. **Effectiveness of Counsel: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only questions of law: Are the undisputed facts contained within the record sufficient to conclusively determine whether counsel did or did not provide effective assistance and was the defendant prejudiced by counsel's alleged deficient performance?
6. **Trial: Evidence: Prosecuting Attorneys: Due Process.** The nondisclosure by the prosecution of material evidence favorable to the defendant, requested by the defendant, violates due process, irrespective of the good faith or bad faith of the prosecution. But due process is not violated where the evidence is disclosed during trial.

7. **Expert Witnesses: Evidence.** An expert's oral, unrecorded opinions do not fall within the scope of Neb. Rev. Stat. § 29-1912(1)(e) (Cum. Supp. 2014).

8. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

9. **Motions for Continuance: Appeal and Error.** There is no abuse of discretion by the court in denying a continuance unless it clearly appears that the party seeking the continuance suffered prejudice as a result of that denial.

10. **Criminal Law: Motions for New Trial: Evidence: Proof.** A criminal defendant who seeks a new trial because of newly discovered evidence must show that if the evidence had been admitted at the former trial, it would have probably produced a substantially different result.

11. **Rules of Evidence: Other Acts.** Under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2014), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

12. ____: ____. Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2014), does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime.

13. ____: ____. Inextricably intertwined evidence includes evidence that forms part of the factual setting of the crime, or evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts, or if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime.

14. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

15. **Jury Instructions: Appeal and Error.** All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and evidence, there is no prejudicial error necessitating reversal.

16. **Criminal Law.** To constitute one an accomplice, he must take some part in the crime, perform some act, or owe some duty to the person in danger that makes it incumbent on him to prevent the commission of the crime. Mere presence, acquiescence, or silence, in the absence of a duty to act, is not enough to constitute one an accomplice. The knowledge that a crime is being committed cannot be said to constitute one an accomplice.

17. **Effectiveness of Counsel: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred.

18. **Postconviction: Effectiveness of Counsel: Appeal and Error.** When a defendant was represented both at trial and on direct appeal by the same lawyers, generally speaking, the defendant's first opportunity to assert ineffective assistance of trial counsel is in a motion for postconviction relief.

19. **Postconviction.** The need for finality in the criminal process requires that a defendant bring all claims for relief at the first opportunity.

20. **Postconviction: Appeal and Error.** A motion for postconviction relief cannot be used to secure review of issues which were known to the defendant and could have been litigated on direct appeal.

21. **Effectiveness of Counsel: Time: Appeal and Error.** Claims of ineffective assistance of counsel raised on direct appeal by the same counsel who represented the defendant at trial are premature and will not be addressed on direct appeal.

22. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.

23. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense.

24. ____: ____. To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

25. ____: ____. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

26. **Trial: Attorneys at Law: Effectiveness of Counsel: Appeal and Error.** When reviewing claims of alleged ineffective assistance of counsel, an

appellate court affords trial counsel due deference to formulate trial strategy and tactics.

27. **Effectiveness of Counsel: Presumptions: Appeal and Error.** The entire ineffectiveness analysis is viewed with a strong presumption that counsel's actions were reasonable and that even if found unreasonable, the error justifies setting aside the judgment only if there was prejudice.

28. **Effectiveness of Counsel: Proof.** In an ineffective assistance of counsel claim, deficient performance and prejudice can be addressed in either order. If it is more appropriate to dispose of an ineffectiveness claim due to lack of sufficient prejudice, that course should be followed.

Appeal from the District Court for Douglas County: GARY B. RANDALL, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Allyson A. Mendoza, and Mary Mullin Dvorak for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust for appellee.

HEAVICAN, C.J., WRIGHT, MILLER-LERMAN, CASSEL, STACY, and KELCH, JJ., and BISHOP, Judge.

CASSEL, J.

## I. INTRODUCTION

In this direct appeal, Tracy N. Parnell challenges his convictions, pursuant to jury verdict, for first degree murder, attempted first degree murder, two counts of use of a deadly weapon to commit a felony, and possession of a weapon by a prohibited person. His two primary arguments attack denials of his motions to continue the trial and for a new trial. These arguments are premised upon untimely disclosure of opinions of a cellular analyst and rely on *Brady v. Maryland*[1] and a discovery statute.[2] He also complains that his earlier threats toward one of the victims were admitted in evidence,

---

[1] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[2] Neb. Rev. Stat. § 29-1912 (Cum. Supp. 2014).

his requested instruction on accomplice testimony was refused, and his trial counsel provided ineffective assistance. Finding no merit in his arguments, we affirm.

## II. BACKGROUND

### 1. Shooting

On October 30, 2012, at around 8:14 p.m., Eriana Carr and Nakia Johnson were shot outside of Carr's residence in Omaha, Nebraska. Carr was shot twice and died from her injuries. Johnson was shot 11 times and survived. Johnson told investigators that the shots came from "a blue Nissan Altima with a messed up front bumper." She did not see the shooter.

### 2. Threat

During a pretrial hearing, Johnson explained how she met Parnell. This occurred at a September 2012 birthday party for one of Johnson's friends, who was involved with Parnell. Johnson knew Parnell only by his nickname, "Laylow." At that birthday party, Johnson had a short conversation with Parnell regarding his car, a blue Nissan Altima. She told him that a Nissan Altima was her favorite car, and Parnell responded, "'That's what's up.'" Then Parnell left.

Johnson told investigators that Parnell threatened her 2 days before the shooting. Johnson testified that the threat occurred on October 28, 2012, after "a little get-together" at her friend's apartment, where she sometimes stayed overnight. Parnell and several other people attended the get-together. A man with whom Johnson was involved, Ryan Fraiser, attended and later left. Fraiser is from another "hood" and a different gang than the others at the party. Johnson went to bed after the party and was awoken by Parnell and three others. They were yelling at Johnson because "they felt like [she] had brought someone into the house from another side," or "[a]nother hood."

Eventually the others left, but Parnell remained. He paced back and forth in front of Johnson's door and was "saying all kind[s] of stuff . . . indirectly to [Johnson]." Johnson

told Parnell to "[s]hut the [expletive] up talking to me," and Parnell left. He returned with a gun in his hand. Parnell stared at Johnson while holding the gun. Johnson grabbed her cell phone, and Parnell told her to call Fraiser and tell him that Parnell would "be outside waiting for him." Johnson was scared and called the 911 emergency dispatch service because Parnell "was blocking [her] way to the door" and she did not know "what was about to happen." When Johnson ended the call, Parnell left.

Parnell was eventually prosecuted for the threat, but not until after the shooting. At that point, the State filed an information charging Parnell with committing terroristic threats. He pled no contest and received a sentence of 20 to 24 months' imprisonment.

### 3. NISSAN ALTIMA

Detectives investigated the Nissan Altima involved in the shooting. They discovered that Parnell had been stopped while driving a blue Nissan Altima several months earlier. The registered owner of the car was Jasmine Nero, who was also the mother of Parnell's child.

An investigator testified that she interviewed Parnell and asked him about the Altima. Parnell claimed that he only drove his aunt's car and that he never drove any of Nero's vehicles. He denied any knowledge of an Altima.

In a call from jail, Parnell spoke to Nero about the Altima. Nero testified at trial that she understood from that call that Parnell wanted her "to get rid of" the car. Nero moved the car to a garage, where investigators later found it. The car's front bumper was damaged, and it contained a box with Parnell's thumbprint on it.

### 4. PRETRIAL MOTIONS

The State filed an information charging Parnell with five counts: murder in the first degree, two counts of use of a deadly weapon to commit a felony, attempted first degree murder, and possession of a deadly weapon by a prohibited

person. The district court ordered mutual and reciprocal discovery "pursuant to statute."

Before trial, the State filed a notice under rule 404[3] of its intent to offer evidence of Parnell's terroristic threat against Johnson to show motive, intent, and plan. Parnell filed a motion in limine requesting to exclude the State's cellular analyst pursuant to the standards of *Daubert*/*Schafersman*.[4] The district court held a joint hearing on the motions. Later, Parnell filed a motion to continue the trial.

### (a) Rule 404

In the portion of the joint hearing related to rule 404, Johnson testified regarding Parnell's threatening behavior before the shooting. The State introduced Johnson's 911 call, a certified copy of Parnell's conviction and sentence for terroristic threats, and police reports about the threat.

In a written order, the district court concluded that Parnell's threatening behavior was inextricably intertwined with the crime charged and therefore not subject to rule 404. It reasoned that it "forms part of the factual setting of the murder. It is evidence that explains an integral part of the immediate context of the crime charged." The district court concluded further that even if the threat was subject to rule 404, it would still be admissible, because it "demonstrates [Parnell's] motive and that the subsequent shooting was gang related; thus it is admissible to show intent."

### (b) *Daubert*/*Schafersman*

In the *Daubert*/*Schafersman* portion of the joint hearing, the State's expert, William Shute, testified regarding his qualifications and methods. Shute is a special agent with the Federal Bureau of Investigation (FBI) and a member of the

---

[3] Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Cum. Supp. 2014).

[4] See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

FBI's "Cellular Analysis Survey Team." He performs "historical cell site analysis" using call detail records provided by cellular carriers.

Shute explained that call detail records show the "first serving cell site," which is the tower a particular cell phone used, and the "first serving cell face," which is the sector of the tower used. Cell towers usually have three sectors. The FBI's survey team members use call detail records to determine "what tower and sector of the tower was being utilized for service" and then plot the towers and sectors on a map. They then look for patterns and "come up with a geographical plot as to where [they] believe that individual is at that particular time."

Shute also testified regarding the locations of Parnell's cell phone around the time of the shooting. He prepared a PowerPoint presentation that included Parnell's call detail records. The records showed that Parnell's cell phone connected to tower: (1) 201 at 7:52 p.m., (2) 729 at 8:07 p.m., (3) 201 at 8:11 p.m., (4) 729 at 8:20 p.m., and (5) 201 at 8:20 p.m. Shute plotted the towers and their coverage areas on a map. The map showed the coverage areas as shaded "pie wedges."

Shute testified that the coverage areas for towers 201 and 729 overlap. He said that the way that Parnell's cell phone switched between towers 201 and 729 showed that it was definitely located within the overlapping coverage area at the time of the shooting. A map in his PowerPoint presentation depicted the crime scene within the overlapping area.

The court overruled Parnell's motion in limine. It concluded that Shute was qualified to testify as an expert and that his methods were reliable.

(c) Motion for Supplemental Discovery

In March 2015, Parnell filed a motion requesting supplemental discovery from the State. The motion is not in our record. Parnell's counsel, Daniel Stockmann, filed an affidavit with the motion. This affidavit is in our record. In it,

Stockmann states that he learned that certain undisclosed discovery materials existed after he attended a March 6, 2015, seminar where cellular analyst Michael O'Kelly presented. In the discovery process, the State had shared a police report and maps showing that O'Kelly had performed basic cell phone mapping services for the Omaha Police Department.

After the seminar, Stockmann e-mailed O'Kelly and asked whether he had performed services for the department which were not disclosed in the police report. O'Kelly's counsel responded and said that although O'Kelly could not disclose what work he had performed for the department, he could confirm that O'Kelly performed more services than were disclosed in the report. Parnell then filed the motion for supplemental discovery regarding O'Kelly's services, which the district court granted.

After the court ordered supplemental discovery, O'Kelly provided Parnell's counsel with an affidavit detailing his interactions with the State, and the State disclosed a series of e-mails between O'Kelly, Det. Sherry King of the Omaha Police Department, and Deputy Douglas County Attorney Brenda Beadle.

In his affidavit, O'Kelly stated that he "reviewed the . . . call detail records and concluded that [Parnell's cell phone] appeared to travel from the west side of Omaha [where Parnell lived] to the east side, then north and south and then traveling back to the general area on the west side." O'Kelly said that he "began processing and mapping the individual cell site registrations. The handset transition west to east, north/south and east to west activities were confirmed." He then "provided Detective King with multiple maps depicting handset movements consistent with cell site registrations that supported physical movement from Omaha's west side to the east side and possible travel movements north and south on the east side."

O'Kelly also stated that he informed King that "it is impossible to identify a specific location stop(s), specific surface

roadway travels based upon the existing cellular data." He told her that "drawing circles and other shapes with defined boundaries is unreliable and at best simple guessing with an agenda. The 'guessing' may be based upon experience and training but will still have no foundation and/or credible support that is rooted with existing electronic wireless data." And he told her that "in order to possibly place the subject [cell phone] in the immediate area of the crime scene . . . it will be necessary to conduct an RF Signal Field Survey." He "provided an explanation of the FBI's RF Signal mapping approach versus the O'Kelly approach." And he explained that his approach to performing such a survey, or drive test, "is time consuming and labor intensive covering days if not weeks." He said that after performing the survey, the tower coverage areas would "appear similar to that of an amoeba and will be unique to each cell site."

In the e-mails, King asked O'Kelly whether he had a formal report to present to the county attorney's office. O'Kelly responded that a report in writing would be "[d]iscoverable" and that he "would recommend the county attorney and I visiting and then letting them decide." Although the documents do not contain a record of a call, they do contain a followup e-mail that indicates that O'Kelly spoke with Beadle.

### (d) Motion to Continue or Exclude

On March 23, 2015, Parnell filed a motion asking the court to exclude Shute's testimony or continue the trial, which was scheduled to begin March 30. The motion was based on the State's "belated disclosure of discovery materials" related to O'Kelly. In the motion, Parnell acknowledged that the State had previously disclosed that O'Kelly worked on the case. He argued that the State violated its duty under § 29-1912 and *Brady v. Maryland*[5] to disclose O'Kelly's opinions that a drive test was necessary and that the FBI's methods were not reliable.

---

[5] *Brady v. Maryland, supra* note 1.

At the hearing on the motion to continue, Parnell offered O'Kelly's affidavit. He did not offer the series of e-mails between O'Kelly, King, and Beadle. Stockmann argued:

> [T]he second that . . . Shute . . . provided the opinions to the government, the government, whether through law enforcement or the county attorney, was aware that an exculpatory opinion from . . . O'Kelly existed. [It had] an obligation to tell me about . . . O'Kelly's exculpatory opinion. [It] didn't tell me about it; I had to find it out on my own because I went to a seminar . . . .

The State responded that O'Kelly's opinion was not exculpatory and that he placed Parnell's cell phone in the same area as had Shute, although he was not as specific.

The court noted that because the State planned to take a week to present its evidence at trial, Parnell had "12 days," and it said that "O'Kelly can get his stuff together in 12 days" in order to testify. It also stated that "[i]f [Parnell] wanted to hire a cell tower expert, [he] could have done it at any time in the last two years."

In its written order, the district court found that the evidence relating to O'Kelly was not exculpatory and that it "[h]ad been provided to [Parnell] at an early date." Therefore, it was not a valid reason for a continuance. The court also entered an order permitting Parnell to retain O'Kelly as an expert witness.

Before trial, Parnell renewed his motion to continue the trial. At that time, he offered an exhibit containing the e-mail exchanges between O'Kelly, King, and Beadle. He said that he "neglected to offer" it at the earlier hearing. The court overruled the renewed motion.

### 5. TRIAL

#### (a) Testimony

At trial, Johnson testified and described the shooting, the blue Nissan Altima, and the threatening incident days earlier. Shute's testimony was consistent with his testimony at the

*Daubert*/*Schafersman* hearing—he stated that towers 201 and 729 form an overlap area and that Parnell must have been within the overlap area at the time of the shooting. O'Kelly was present throughout the trial but did not testify.

Nero testified regarding the Altima and her relationship with Parnell. She stated that on the night of the shooting, she left Parnell at home with her children while she took her niece to ballet class. She left the Altima at home and drove another vehicle. When Nero returned at 8 p.m., Parnell, her children, and the Altima were not there. Parnell and the children returned in the Altima later that night.

Nero also testified that she lied to police for Parnell and was charged with being an accessory to a felony as a result. She said that when detectives asked her about the Altima, she lied and told them that it was not working. She admitted that she did so "[t]o protect [Parnell]" because "he asked [her] to lie."

(b) Jury Instruction

Parnell requested a jury instruction regarding accomplice testimony based on NJI2d Crim. 5.6. The requested instruction read as follows:

There has been testimony from . . . Nero, a claimed accomplice of [Parnell]. You should closely examine her testimony for any possible motive she might have to testify falsely. You should hesitate to convict [Parnell] if you decide that . . . Nero testified falsely about an important matter and that there is no other evidence to support her testimony.

In any event, you should convict [Parnell] only if the evidence satisfies you beyond a reasonable doubt of his guilt.

The district court refused the instruction and gave a general instruction regarding witness credibility. The jury found Parnell guilty on all counts.

### 6. Motion for New Trial

Parnell filed a timely motion for a new trial and submitted another affidavit from O'Kelly as support. He argued that O'Kelly's statements in this second affidavit constitute newly discovered evidence, which could not have been discovered and produced at trial.

In O'Kelly's affidavit, he averred that after his initial work on Parnell's case, he "informed the government that additional field testing by means of a 'drive test' would be required in order to move from speculation to accuracy in the cell tower connection plotting." A drive test involves making cell phone calls while driving and then obtaining call detail records to see which towers the cell phone used. Shute did not perform such a drive test. O'Kelly was extremely critical of Shute's methods and conclusions.

O'Kelly began a drive test on the last day of the trial. In his affidavit, he stated that the drive test revealed that the crime scene was "situated in a valley between Cell Sites 729 and 201" and that towers 201 and 729 are 1.84 miles apart. The drive test showed that the coverage areas for towers 201 and 729 do not overlap or border each other, as Shute claimed. Instead, they are separated by five other towers, which provide coverage in the overlap area that Shute identified. O'Kelly said that Parnell would have had to leave the crime scene area in order to connect to tower 729. However, he also said that the data showed that Parnell's cell phone "was in the general vicinity (1 - 2 miles of the crime scene) before, during and after the shooting."

The district court overruled Parnell's motion for a new trial. In a written order, it first concluded that Parnell could have discovered and produced O'Kelly's opinions using reasonable diligence, or, he could have at least "diminished the weight of . . . Shute's conclusions by calling O'Kelly as a witness." The court noted that Parnell was "at least partially at fault for the late discovery," because the State disclosed that O'Kelly worked on the case early in the discovery process.

Second, the court concluded that O'Kelly's opinions were not material, because they would not have affected the outcome of the trial. It reasoned that O'Kelly's drive test results "seem to incriminate [Parnell]," because Parnell made several calls around the time of the shooting that connected to tower 201, and O'Kelly's test showed that the signals from tower 201 "permeate the area immediately surrounding the crime scene."

## III. ASSIGNMENTS OF ERROR

Parnell assigns, reordered, that the district court erred in (1) overruling his motion to continue or exclude Shute's testimony, (2) overruling his motion for a new trial, (3) determining that Parnell's threat against Johnson was inextricably intertwined with the shooting, and (4) refusing his proposed jury instruction regarding accomplice testimony. Parnell also claims that his trial counsel was ineffective because he did not have O'Kelly testify as an expert witness at trial.

## IV. STANDARD OF REVIEW

[1-3] Several issues are controlled by an abuse of discretion standard. An appellate court reviews a judge's ruling on a motion to continue for an abuse of discretion.[6] In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.[7] It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under rule 404(2), and the trial court's decision will not be reversed absent an abuse of discretion.[8]

[4,5] The other issues present legal questions. Whether a jury instruction is correct is a question of law, which an

---

[6] *Moreno v. City of Gering*, 293 Neb. 320, 878 N.W.2d 529 (2016).

[7] *State v. Cardeilhac*, 293 Neb. 200, 876 N.W.2d 876 (2016).

[8] *State v. Cullen*, 292 Neb. 30, 870 N.W.2d 784 (2015).

appellate court independently decides.[9] Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law.[10] In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only questions of law: Are the undisputed facts contained within the record sufficient to conclusively determine whether counsel did or did not provide effective assistance and was the defendant prejudiced by counsel's alleged deficient performance?[11]

## V. ANALYSIS

### 1. Motion to Continue
### or Exclude

Parnell assigns that the district court abused its discretion in overruling his motion to continue the trial or exclude Shute's testimony. His arguments are premised on *Brady v. Maryland*[12] and § 29-1912. Regarding *Brady*, he argues that the timing of the State's disclosure of O'Kelly's opinions violated his constitutional right to due process. Regarding § 29-1912, he argues that the State should have disclosed O'Kelly's opinions, because that section "require[s] 'more than the constitutional minimum' with respect to disclosure of exculpatory information."[13]

[6] First, we conclude that the timing of the State's disclosure of O'Kelly's opinions did not violate Parnell's right to due process. Under *Brady*, the nondisclosure by the prosecution of material evidence favorable to the defendant, requested by the defendant, violates due process, irrespective of the good faith

---

[9] *State v. Duncan*, 293 Neb. 359, 878 N.W.2d 363 (2016).

[10] *Id.*

[11] *Id.*

[12] *Brady v. Maryland, supra* note 1.

[13] Brief for appellant at 15 (quoting *State v. Kula*, 252 Neb. 471, 562 N.W.2d 717 (1997)).

or bad faith of the prosecution.[14] Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule.[15] But *Brady* is not violated where the evidence is disclosed during trial.[16] And here, the State disclosed the pertinent evidence 1 week *before* trial. Clearly, Parnell's right to due process was not violated by the timing of the disclosure.

Second, we must determine whether the timing of the disclosure violated § 29-1912. That section governs discovery in criminal cases in Nebraska.[17] It sets out specific categories of information that a defendant may request the court to order the State to disclose. Of § 29-1912's categories, only subsection (1)(e) is potentially applicable to O'Kelly's late-disclosed opinions. Section 29-1912(1) provides that a defendant may request permission to "inspect and copy or photograph": "(e) The results and reports of physical or mental examinations, and of scientific tests, or experiments made in connection with the particular case, or copies thereof." Parnell filed a motion for discovery in July 2013, which included a request for this information. The district court ordered "Mutual and Reciprocal Discovery pursuant to statute."

At first blush, it might seem that O'Kelly's opinion (that a drive test was required to place Parnell with certainty near the crime scene) could be considered to be a result or report of a physical examination or scientific test, because it was based on his examination of the data provided by the State. But careful consideration of our precedents and the federal courts' interpretation of similar language persuade us otherwise.

---

[14] *Brady v. Maryland, supra* note 1; *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016).

[15] *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *State v. Patton*, 287 Neb. 899, 845 N.W.2d 572 (2014).

[16] *U.S. v. Gonzales*, 90 F.3d 1363 (8th Cir. 1996); *State v. Smith, supra* note 14.

[17] *State v. Smith, supra* note 14.

We conclude that O'Kelly's opinion did not fall within the scope of § 29-1912(1)(e) for two reasons. First, it was unrecorded. Second, it was not a result or report. We explain each reason in more detail.

Section 29-1912(1)(e) did not require the State to disclose O'Kelly's oral, unrecorded opinions. Although we have never considered this issue, federal courts have. We may rely upon federal court decisions for guidance, because discovery in criminal cases, as authorized by § 29-1912, is patterned on the Federal Rules of Criminal Procedure.[18] Like § 29-1912(1)(e), Fed. R. Crim. P. 16(a)(1)(F) provides that the government must permit a defendant "to inspect and to copy or photograph the results or reports of any physical or mental examination and of any scientific test or experiment."

Several federal circuit court decisions illustrate this reasoning. In *United States v. Shue*,[19] an expert examined a photograph the evening before he testified and he gave the government his opinion regarding similarities between the subject of the photograph and the defendant. The defendant claimed that the government was required to disclose the expert's conclusions under an earlier version of the corresponding federal rule. The Court of Appeals for the Seventh Circuit disagreed. It reasoned that "[a]lthough the phrase 'any results or reports' does not exclude oral reports, the language 'the government shall permit the defendant to *inspect and copy or photograph*' . . . suggests that [the rule] refers only to written reports."[20] It also noted that the defendant had access to the photographs the expert examined and only contended that the government was required to disclose "the contents of oral statements made by the expert after comparing the photographs."[21] The court

---

[18] See *State v. Brown*, 214 Neb. 665, 335 N.W.2d 542 (1983).

[19] *United States v. Shue*, 766 F.2d 1122 (7th Cir. 1985).

[20] *Id.* at 1135 (emphasis in original).

[21] *Id.*

concluded that disclosure was not required by the corresponding federal rule. Similarly, in *U.S. v. Smith*,[22] the government did not reveal that a ballistics expert had test-fired a weapon and reached conclusions based upon the test-firing. The defendant claimed that the government violated its discovery obligations under the federal rule by failing to inform him about the test. The Court of Appeals for the First Circuit disagreed. It observed that "the words 'inspect and copy or photograph' logically suggest that the items to be disclosed be tangible enough to be susceptible to inspection, copying or photographing."[23] It held that "where the test result in question consisted of the expert's unrecorded comparison of the test-firing casings with those at the crime scene, [the federal rule] did not obligate the government to produce in advance the expert's conclusions."[24] And in *U.S. v. Peters*,[25] the Court of Appeals for the Ninth Circuit concluded that the federal rule "refer[s] only to information recorded in some tangible form."[26]

[7] We reach the same conclusion. Under the plain language of § 29-1912(1), the defendant may request the court to order the State to permit him to "*inspect and copy or photograph*" the results and reports of physical or mental examinations and scientific tests or experiments. (Emphasis supplied.) Inspecting, copying, or photographing clearly require a tangible item. Oral, unrecorded opinions do not fall within the scope of this language.

Turning to the second reason, we conclude that O'Kelly's opinion did not constitute a result or report of an examination or test. In *State v. Brown*,[27] we addressed whether experts'

---

[22] *U.S. v. Smith*, 101 F.3d 202 (1st Cir. 1996).

[23] *Id.* at 209.

[24] *Id.* at 210.

[25] *U.S. v. Peters*, 937 F.2d 1422 (9th Cir. 1991).

[26] *Id.* at 1425.

[27] *State v. Brown, supra* note 18.

opinions constituted reports of examinations. There, the defendant learned through notes contained in a presentence report that the police had obtained certain opinions from experts, which had not been disclosed. The notes revealed that during the investigation, the police contacted a psychologist and a pathologist. The psychologist opined that based upon the officers' descriptions of the victim, the victim might be a pathological liar. The pathologist examined photographs depicting the victim's injuries and concluded that the injuries were not consistent with the victim's version of events. The defendant claimed that the State should have disclosed the notes, because they contained results or reports of physical or mental examinations or scientific tests under § 29-1912(1)(e).

We drew a distinction between the opinions of the psychologist and the pathologist. We concluded that the State was not required to disclose notes containing the psychologist's opinions, because

> [t]he information from the psychologist was based upon subjective data supplied by one of the investigating officers, which apparently included the officer's impressions and conclusions concerning [the victim]. The response by the psychologist may have been a commentary on the data supplied by the police, but the psychologist's response did not constitute a report of an examination under the circumstances.[28]

By contrast, we concluded that the pathologist's opinions did constitute a report of an examination. We reasoned that

> after his examination of [the victim's] photographs, the pathologist expressed an opinion to the police regarding both the means used and the manner in which wounds were inflicted upon the victim . . . . The pathologist's opinion concerning causation of the wounds was a report within the purview of § 29-1912(1)(e), and the State

---

[28] *Id.* at 675, 335 N.W.2d at 548.

should have disclosed those parts of the detective's notes containing the report from the pathologist.[29]

While our conclusion in *Brown* turned on the fact that the psychologist had not performed an "examination," at least one federal court has focused instead on whether the information at issue constituted a "result" or "report." In *U.S. v. Iglesias*,[30] the defendant claimed that "'log notes'" and other documents from the drug testing laboratory constituted results or reports. The Court of Appeals for the Ninth Circuit disagreed. It characterized the log notes as "internal documents" and concluded that they "do not have the requisite formality or finality to be considered as either a 'report' or a 'result.'"[31] It reasoned that while defendants have "rights to inspect and copy the actual results or reports of scientific tests, we are not willing to force the government to disclose every single piece of paper that is generated internally in conjunction with such tests."[32]

Taken together, *Brown* and *Iglesias* convince us that O'Kelly's late-disclosed opinions were not results or reports of examinations or scientific tests. Like the psychologist's opinions in *Brown*, O'Kelly's opinion that more testing was required to place Parnell with certainty near the crime scene was akin to commentary on the data supplied by the police; he was commenting on the need for more data, rather than reporting results or conclusions of an examination. His reports and results were contained in the maps that he provided to King, which were disclosed to Parnell early in discovery. And like the log notes in *Iglesias*, O'Kelly's opinions did not have the requisite formality to be considered results or reports. His opinions regarding the need for more testing were more akin to an internal, informal document.

---

[29] *Id.* at 675-76, 335 N.W.2d at 548.

[30] *U.S. v. Iglesias*, 881 F.2d 1519, 1521 (9th Cir. 1989).

[31] *Id.* at 1523.

[32] *Id.* at 1524.

Because O'Kelly's opinions do not fall within the scope of § 29-1912(1)(e), the State had no duty to disclose them pursuant to that section.

Having concluded that *Brady* and § 29-1912 were not violated, we must now determine whether the district court abused its discretion in overruling Parnell's motion to continue the trial or exclude Shute's testimony.[33] Parnell argues that the district court abused its discretion because O'Kelly did not have enough time to perform a drive test before trial. We disagree.

[8,9] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[34] And there is no abuse of discretion by the court in denying a continuance unless it clearly appears that the party seeking the continuance suffered prejudice as a result of that denial.[35]

Parnell did not make it clear to the district court that O'Kelly could not perform a drive test before trial. O'Kelly stated in his affidavit that a drive test would take him "days if not weeks" to complete. And the court noted at the hearing that because the State planned to take more than a week to present its case, O'Kelly would have 12 days to prepare to testify. It reasoned that O'Kelly could prepare within that time. Parnell's counsel did not state that O'Kelly would need more than 12 days to perform a drive test. Considering the evidence presented, it was not unreasonable for the court to overrule the motion to continue. We therefore conclude that the district court did not abuse its discretion in overruling Parnell's motion to continue the trial or exclude Shute's testimony.

## 2. New Trial

Parnell asserts that the district court erred in overruling his motion for a new trial, because O'Kelly's opinions constituted

---

[33] See *State v. Edwards*, 278 Neb. 55, 767 N.W.2d 784 (2009).

[34] *Id.*

[35] *Id.*

newly discovered evidence. He argues that he could not have discovered and presented O'Kelly's testimony at trial with reasonable diligence. And he argues that O'Kelly's testimony would have been material, because "Shute's testimony was instrumental in placing [Parnell] near the crime scene."[36]

[10] A new trial can be granted on grounds materially affecting the substantial rights of the defendant, including "'newly discovered evidence material for the defendant which he or she could not with reasonable diligence have discovered and produced at the trial.'"[37] A criminal defendant who seeks a new trial because of newly discovered evidence must show that if the evidence had been admitted at the former trial, it would have probably produced a substantially different result.[38] We review the ruling denying a motion for new trial in a criminal case for an abuse of discretion.[39]

This assignment fails. We assume that O'Kelly's opinions constituted newly discovered evidence. Nevertheless, they did not warrant a new trial, because they did not create a reasonable probability of a substantially different result. We reach this conclusion for two reasons—first, O'Kelly's conclusions regarding the records would not have placed in doubt Parnell's presence at the location of the crime, and second, Johnson's and Nero's testimonies against Parnell were powerful and compelling.

As the district court noted, O'Kelly's opinions would not have been particularly helpful to Parnell. O'Kelly was critical of Shute's methods of analysis and his conclusions regarding the overlap area. But he also acknowledged that the crime scene was "situated in a valley between Cell Sites 729 and 201" and that Parnell's cell phone connected to tower 201

---

[36] Brief for appellant at 20.

[37] *State v. Nelson*, 282 Neb. 767, 782, 807 N.W.2d 769, 782 (2011) (quoting Neb. Rev. Stat. § 29-2101(5) (Reissue 2008)).

[38] *State v. Nelson, supra* note 37.

[39] *Id.*

around the time of the shooting. And he placed Parnell's cell phone "in the general vicinity (1 - 2 miles of the crime scene) before, during and after the shooting." Thus, although O'Kelly critiqued Shute's methods, he reached conclusions similar to Shute's. O'Kelly's opinions did not create a reasonable probability of a substantially different outcome of Parnell's trial.

The State presented powerful and compelling evidence against Parnell in the testimonies of Johnson and Nero. Johnson testified that Parnell threatened her with a gun just 2 days before the shooting. And her description of the shooter's car—"a blue Nissan Altima with a messed up front bumper"—matched the Altima Parnell drove. Additionally, Nero's testimony established that Parnell drove the Altima on the evening of the shooting and that Parnell wanted her to hide the car following the shooting. Furthermore, a detective testified that Parnell lied and claimed that he had no knowledge of an Altima, despite the fact that he had been stopped while driving an Altima months earlier. This evidence substantially diminishes the importance of the precision of the cell phone information.

Because O'Kelly's opinions did not create a reasonable probability of a substantially different result, the district court did not abuse its discretion in overruling Parnell's motion for a new trial.

## 3. Rule 404

Parnell assigns that the district court erred in concluding that the evidence of his terroristic threat against Johnson was inextricably intertwined with the crimes charged. He argues that the evidence should have been excluded pursuant to rule 404. We disagree.

[11] Rule 404 provides:

> (2) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may,

however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identify, or absence of mistake or accident.

(3) When such evidence is admissible pursuant to this section, in criminal cases evidence of other crimes, wrongs, or acts of the accused may be offered in evidence by the prosecution if the prosecution proves to the court by clear and convincing evidence that the accused committed the crime, wrong, or act. Such proof shall first be made outside the presence of any jury.

[12,13] Rule 404(2), however, does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime.[40] Inextricably intertwined evidence includes evidence that forms part of the factual setting of the crime, or evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts, or if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime.[41]

We have previously concluded that a defendant's threatening behavior was inextricably intertwined with charged crimes. In *State v. Smith*,[42] the defendant was charged with first degree murder and second degree assault in connection with the shooting of several victims. The State introduced testimony that the defendant had threatened two of the victims twice in the month before the shooting. The testimony indicated that the defendant had previously been friends with the victims and that he threatened them because he believed they were "'snitches.'"[43] The defendant claimed that the evidence of his threats was subject to rule 404(2). We disagreed and

---

[40] *State v. Cullen, supra* note 8.

[41] See *State v. Ash*, 286 Neb. 681, 838 N.W.2d 273 (2013).

[42] *State v. Smith*, 286 Neb. 856, 839 N.W.2d 333 (2013).

[43] *Id.* at 860, 839 N.W.2d at 343.

concluded that the evidence of the threats "was part of the factual setting of the instant crimes and was necessary to present a coherent picture."[44] We noted that without the evidence of the threats, it would have "appear[ed] to the jury that [the defendant], who was a friend of [the victims], . . . aided and abetted in the random shooting of five people."[45]

Like *Smith*, the evidence of Parnell's threat against Johnson was necessary to present a coherent picture of the shooting. The evidence of the threats established that Parnell was upset with Johnson just 2 days before the shooting, because she brought a person from a rival gang to a party. Without this evidence, it would have appeared to the jury that Parnell randomly shot Carr and Johnson, because the only other interaction between Johnson and Parnell was at the birthday party where Johnson complimented Parnell's car.

The evidence was not used to establish that Parnell had the propensity to shoot Carr and Johnson. It was used to establish that Parnell threatened Johnson and acted upon that threat 2 days later.[46] Accordingly, the evidence was inextricably intertwined with the shooting and not subject to rule 404. The district court did not abuse its discretion in admitting this evidence.

### 4. Jury Instruction

Parnell assigns that the district court erred in refusing his proposed jury instruction regarding accomplice testimony. We disagree. The proposed jury instruction was not warranted by the evidence.

[14,15] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the

---

[44] *Id.* at 881, 839 N.W.2d at 355.

[45] *Id.* at 881, 839 N.W.2d at 355-56.

[46] See *State v. Smith, supra* note 42.

evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.[47] All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and evidence, there is no prejudicial error necessitating reversal.[48]

We addressed whether an accomplice jury instruction was warranted by the evidence in *State v. Mason*.[49] There, the defendant argued that two witnesses constituted accomplices because they were present when the defendant shot the victim and because they later lied to the police about their involvement. Like the instant case, the defendant requested a jury instruction based upon NJI2d Crim. 5.6, and the court rejected it and gave a more general credibility instruction.

[16] We concluded in *Mason* that the evidence did not warrant an accomplice instruction. We noted that an accomplice

"""must take some part in the crime, perform some act, or owe some duty to the person in danger that makes it incumbent on him to prevent the commission of the crime. Mere presence, acquiescence, or silence, in the absence of a duty to act, is not enough, however reprehensible it may be, to constitute one an accomplice. The knowledge that a crime is being or is about to be committed cannot be said to constitute one an accomplice. . . ."""[50]

And we reasoned that the witnesses were not accomplices, because there was no evidence that they were involved in a plan to shoot the victim. We also rejected the defendant's claim that their attempts to cover up the crime rendered them accomplices. We said "such evidence point[ed] to their

---

[47] *State v. Duncan, supra* note 9.

[48] *Id.*

[49] *State v. Mason*, 271 Neb. 16, 709 N.W.2d 638 (2006).

[50] *Id.* at 29, 709 N.W.2d at 650-51 (quoting *State v. Sutton*, 231 Neb. 30, 434 N.W.2d 689 (1989)).

possibly being 'accessories after the fact.'"[51] We concluded that the more general instruction regarding witness credibility was sufficient.

Like *Mason*, Parnell's proposed instruction was not warranted by the evidence. Parnell argues that Nero could have been considered an accomplice, because she provided Parnell with access to the Altima and because she lied to the police. But those actions did not render her an accomplice. The evidence established that Parnell always had access to Nero's Altima. There was no evidence that Nero provided him access on the night of the shooting for the purpose of helping with the crime or that she was even aware of the crime. And Nero's lies to investigators, like the lies in *Mason*, happened after the crime. They point to her being an accessory after the fact, not an accomplice.

Because the accomplice instruction was not warranted by the evidence, the general credibility instruction was sufficient to address Nero's testimony. Therefore, the district court did not err in refusing the proposed jury instruction.

5. INEFFECTIVE ASSISTANCE

Parnell claims that his counsel was ineffective because he did not call O'Kelly to testify at trial. He argues that even though O'Kelly had not completed the drive test, his counsel should have called O'Kelly to critique Shute's methods and conclusions.

(a) Different Counsel on Claims
of Ineffective Assistance

[17,18] We must first determine whether Parnell may raise this claim in this direct appeal. Ordinarily, when a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue

---

[51] *Id.* at 30, 709 N.W.2d at 651. See, also, *State v. Banks*, 278 Neb. 342, 771 N.W.2d 75 (2009).

of trial counsel's ineffective performance which is known to the defendant or is apparent from the record.[52] Otherwise, the issue will be procedurally barred.[53] But when a defendant was represented both at trial and on direct appeal by the same lawyers, generally speaking, the defendant's first opportunity to assert ineffective assistance of trial counsel is in a motion for postconviction relief.[54]

[19,20] These legal rules are driven by a fundamental principle: The need for finality in the criminal process requires that a defendant bring all claims for relief at the first opportunity.[55] The purpose of affording postconviction relief is to correct errors of constitutional proportion which otherwise could not have been raised on direct appeal.[56] It naturally follows that a motion for postconviction relief cannot be used as a substitute for an appeal or to secure a further review of issues already litigated on direct appeal or which were known to the defendant and counsel at the time of the trial and which were capable of being raised, but were not raised, in the defendant's direct appeal.[57]

### (b) Appellate Rules of Procedure

We have several appellate rules governing counsel of record. These rules are intended to ensure orderly proceedings.[58] And failure to follow them could not only disrupt the proceedings, but also deprive a defendant of his or her constitutional right to counsel.[59] Where ineffective assistance of

---

[52] *State v. Ash*, 293 Neb. 583, 878 N.W.2d 569 (2016).

[53] *Id.*

[54] *State v. Abdulkadir*, 293 Neb. 560, 878 N.W.2d 390 (2016).

[55] *State v. DeJong*, 292 Neb. 305, 872 N.W.2d 275 (2015).

[56] *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006).

[57] *Id.*

[58] See *State v. Ortega*, 290 Neb. 172, 859 N.W.2d 305 (2015).

[59] See, e.g., *State v. Agok*, 22 Neb. App. 536, 857 N.W.2d 72 (2014).

counsel is urged, these rules have another substantive component—they enable us to easily distinguish trial counsel from appellate counsel. If these rules are not strictly followed, then our review of ineffectiveness claims could be frustrated or unnecessarily complicated.

One rule ensures that appointed counsel will take the necessary steps to perfect an appeal. "Counsel appointed in district court to represent a defendant in a criminal case other than a postconviction action shall, upon request by the defendant after judgment, file a notice of appeal and continue to represent the defendant unless permitted to withdraw by this court."[60]

Another rule ensures continuity of counsel from the trial court to the appellate court.

> The attorneys of record . . . of the respective parties in the court below shall be deemed the attorneys . . . of the same parties in this court, until a withdrawal of appearance has been filed . . . . Counsel in any criminal case pending in this court may withdraw only after obtaining permission of this court.[61]

Yet another rule requires the trial court clerk to certify to the appellate court the names and contact information regarding the attorneys of record in the court below.[62] Together, these rules ensure that the appellate court has been provided with accurate and up-to-date identification of counsel representing a defendant in a criminal case.

But noncompliance with the rules can thwart the reliability of the process and add unnecessary complexity. If an attorney fails to file a written motion seeking, and obtain a written order granting, leave to withdraw, the record may continue to reflect the appearance of a lawyer who is no longer representing a

---

[60] Neb. Ct. R. App. P. § 2-103(A).

[61] Neb. Ct. R. App. P. § 2-101(F)(1) (rev. 2015).

[62] See § 2-101(B)(5)(b).

party. And this can easily lead to an incorrect certification of counsel by the trial court clerk. If an attorney purports to obtain permission to withdraw from a trial court but fails to ensure that an order memorializing the withdrawal is timely filed in the trial court, he or she has not fulfilled this duty. If new counsel has been appointed for an appeal but the former counsel has not withdrawn before an appeal is perfected, the former counsel must promptly withdraw in the appellate court. And if the trial court clerk fails to diligently and accurately certify the counsel of record at the time of the taking of an appeal, needless corrections will be required.

Because of the unnecessary disruption to orderly appellate procedure, the appellate courts will strictly enforce the requirements of these rules.

### (c) Identification of Parnell's Counsel

The trial court initially certified four counsel of record for Parnell: three private attorneys and one member of the Douglas County public defender's office, Kelly Steenbock. An amended certificate deleted one of the private attorneys and substituted Allyson Mendoza, another member of the public defender's office. Mendoza appeared on behalf of Parnell at a pretrial hearing, and she was also one of the counsel designated on Parnell's appellate brief. Thus, the amended certificate showed two members of the public defender's office and two private attorneys, Stockmann and Stephanie S. Shearer. The bill of exceptions shows the same four attorneys as counsel for Parnell.

As of the date of oral argument, none of these four attorneys had sought leave to withdraw in this court. But Steenbock, Stockmann, and Shearer were not listed as counsel on Parnell's appellate brief. And there was no other filing in this court suggesting that Steenbock, Stockmann, or Shearer played any role as counsel for Parnell on appeal.

[21] The certification of Steenbock as counsel on appeal may be erroneous, but poses no difficulty on direct appeal.

Claims of ineffective assistance of counsel raised on direct appeal by the same counsel who represented the defendant at trial are premature and will not be addressed on direct appeal.[63] And because Steenbock and Mendoza work for the same public defender's office, they are considered as the same counsel for purposes of that rule.[64] Thus, we would not address an ineffectiveness claim directed at Steenbock in this direct appeal. It is clear from our record that Steenbock participated in several pretrial proceedings. But it is also clear from the record that she did not participate in any of the proceedings pertinent to the claim of ineffective assistance raised in this appeal.

As to Stockmann and Shearer, the situation differs. They were certified as counsel of record and did not initially file a withdrawal in this court. And the bill of exceptions shows their participation at trial on the precise matter raised—failure to call O'Kelly as a witness. Because Parnell's previous attorneys were still counsel of record, the State was "unsure whether Parnell can raise ineffective assistance of counsel claims on direct appeal."[65]

In order to resolve the uncertainty regarding Stockmann and Shearer's status as counsel on appeal, we issued an order to show cause regarding their apparent failure to withdraw as counsel for Parnell in this court. Stockmann, Shearer, and Mendoza filed affidavits in response.

Mendoza explained that she and Steenbock were the initial attorneys appointed to represent Parnell. They represented him in "several pretrial matters, including the preliminary hearing and plea in abatement." When they became aware of a conflict, the trial court removed the public defender's office and appointed Stockmann and Shearer to represent Parnell.

---

[63] *State v. Dunster*, 278 Neb. 268, 769 N.W.2d 401 (2009).

[64] See *State v. Soukharith*, 260 Neb. 478, 618 N.W.2d 409 (2000).

[65] Brief for appellee at 38.

Mendoza stated that Stockmann and Shearer represented Parnell for the remainder of the case in the trial court. After trial, the public defender's office was reappointed to represent Parnell because "the original conflict of interest . . . no longer existed." Mendoza and another attorney from the office were assigned to represent Parnell on appeal.

Regarding their participation in this appeal, Stockmann and Shearer stated that they represented Parnell throughout trial and sentencing. After sentencing, they had no further contact with Parnell and did not participate in this appeal. Mendoza confirmed in her affidavit that Stockmann and Shearer did not act as Parnell's counsel at any time in this appeal.

Regarding their apparent failure to withdraw, Stockmann and Shearer explained that Shearer asked the trial court to allow them to withdraw after Parnell's sentencing. The trial judge informed Shearer that they were allowed to withdraw and that he would appoint attorneys from the public defender's office to represent Parnell on appeal. Stockmann and Shearer both stated that they did not comply with our rules requiring formal withdrawal because they "did not consider [themselves] to be the attorney of record when the notice of appeal in [Parnell's] case was filed in the court below." Neither claimed that they requested a formal order reflecting their withdrawal in the trial court. And Shearer noted in her affidavit that she "receiv[ed] notices from the Supreme Court concerning [Parnell's] case." She said that she "contacted the Clerk of the Supreme Court" and "was informed that the case was certified indicating I was representing [Parnell]."

It is apparent that Stockmann and Shearer intended to withdraw in the trial court. But our record does not contain an order memorializing their withdrawal. If such an order existed and if it was filed before Parnell's appeal was perfected, it was error for the clerk to certify them as counsel on appeal. But without an order memorializing their withdrawal, Stockmann and Shearer remained counsel of record and were properly certified

as appellate counsel to this court. Once certified, they had a duty to file a request to withdraw in this court. They did not do so.

We digress to urge attorneys not to ignore notices received from this court or the Nebraska Court of Appeals. It does not matter whether an attorney believes that he or she is no longer counsel of record. Notices from this court's clerk are sent only to counsel of record; notices are not sent to counsel unless counsel was certified as such by the trial court. If an attorney receives a notice from our clerk but believes that he or she has withdrawn, the attorney should promptly communicate with the clerk's office to resolve his or her status. Then, the attorney should take the steps necessary to either (1) ensure that a corrected certificate is transmitted by the trial court clerk to the appellate court or (2) file and serve a motion to withdraw as counsel in the appellate courts.

In light of the responses to our order to show cause, we conclude that we can address this ineffectiveness claim on direct appeal. Although Parnell was technically still represented by his previous attorneys when the appeal was perfected, they were not involved in this appeal. And Parnell is aware of his ineffectiveness claim and capable of raising it here. Delaying review of this claim to the postconviction stage would not serve the purpose of postconviction review. We therefore turn to the merits of Parnell's ineffectiveness claim.

### (d) Merits of Ineffectiveness Claim

[22] The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved.[66] The determining factor is whether the record is sufficient to adequately review the question.[67]

---

[66] *State v. Duncan, supra* note 9.

[67] *Id.*

[23-25] To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[68] the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense.[69] To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.[70] To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[71]

[26-28] When reviewing claims of alleged ineffective assistance of counsel, an appellate court affords trial counsel due deference to formulate trial strategy and tactics.[72] The entire ineffectiveness analysis is viewed with a strong presumption that counsel's actions were reasonable and that even if found unreasonable, the error justifies setting aside the judgment only if there was prejudice.[73] Deficient performance and prejudice can be addressed in either order.[74] If it is more appropriate to dispose of an ineffectiveness claim due to lack of sufficient prejudice, that course should be followed.[75]

Parnell's ineffectiveness claim fails because there is no reasonable probability that but for his counsel's failure to call O'Kelly, Parnell would have been acquitted. As we explained above, there was compelling evidence against Parnell. At most, O'Kelly's opinions would have degraded the precision

---

[68] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[69] *State v. Duncan, supra* note 9.

[70] *Id.*

[71] *Id.*

[72] *State v. Huston*, 291 Neb. 708, 868 N.W.2d 766 (2015).

[73] *State v. Duncan, supra* note 9.

[74] *Id.*

[75] *Id.*

accorded to the cell phone testimony. O'Kelly ultimately concluded that Parnell's cell phone was near the crime scene when the shooting occurred. The outcome would not have been different had O'Kelly testified and criticized Shute's methods. Therefore, the record conclusively refutes that Parnell was prejudiced by his counsel's conduct.

## VI. CONCLUSION

We conclude that the district court did not abuse its discretion in overruling Parnell's motions to continue the trial and for a new trial. We also conclude that the court did not abuse its discretion in admitting evidence of Parnell's threats against Johnson. We conclude further that the district court did not err in rejecting Parnell's jury instruction and that Parnell did not receive ineffective assistance of counsel. We therefore affirm Parnell's convictions.

AFFIRMED.

CONNOLLY, J., not participating