IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF GABRIEL S. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF GABRIEL S. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

TERRI S., APPELLANT.

Filed May 20, 2025.    No. A-24-519.

Appeal from the Separate Juvenile Court of Douglas County: VERNON DANIELS, Judge. Affirmed.

Erick A. Martin, of Martin Law, L.L.C., for appellant.

Christine P. Costantakos and Patrick A. Campagna, guardians ad litem.

PIRTLE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Terri S. appeals from an order of the separate juvenile court of Douglas County terminating her parental rights to her children, Serenity S., Heavenly S., Noah W., Christian W., and Samson W. We affirm.

## II. BACKGROUND

### 1. PROCEDURAL BACKGROUND

Terri is the biological mother of Serenity (born in 2013), Heavenly (born in 2014), Noah (born in 2016), Christian (born in 2019), and Samson (born in 2021). Terri is also the biological mother of Gabriel S. (born in 2004), however, the juvenile court terminated jurisdiction over

- 1 -

Gabriel on March 8, 2023. Because Gabriel is not a subject of this appeal, he will only be discussed as necessary. Randy W. is the biological father of all the children except Gabriel, and his parental rights to the children were terminated in March 2024. Because Randy is not involved in this appeal, he will only be discussed as necessary.

On February 5, 2020, the State filed a petition alleging that Gabriel, Serenity, Heavenly, Noah, and Christian were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2024), because they lacked proper parental care by reason of the fault or habits of Terri in that:

A. Terri . . . was previously involved in the Douglas County Juvenile Court under 3(A) docket [case number].

B. On or about January 28, 2020[,] law enforcement responded to the family home regarding a domestic violence incident between Terri . . . and Randy . . . with four of the minor children present.

C. Terri['s] . . . use of alcohol and/or controlled substances places said juveniles at risk for harm.

D. Terri . . . has failed to provide for the daily needs, educational needs, and/or safety of said juveniles.

E. Terri . . . has failed to provide care, support and supervision for above named juvenile[s].

F. Due to these reasons, above named juveniles are at risk of harm.

Also on February 5, the State filed an ex parte motion for immediate custody and pickup. The juvenile court entered an ex parte order that same day, granting temporary custody of the children to the Nebraska Department of Health and Human Services (DHHS) for appropriate placement. The children have remained in foster care ever since.

On April 14, 2020, Gabriel, Serenity, Heavenly, Noah, and Christian, were adjudicated to be within the meaning of § 43-247(3)(a) based on Terri's admissions to the allegations in B, E, and F of the petition. The allegations in A, C, and D were dismissed pursuant to a plea. Terri was ordered to obtain and maintain safe, stable, and adequate housing and provide proof to the case manager; obtain and maintain a legal, stable source of income and provide proof to the case manager; within 24 hours, complete a budget (and timely supplements) to assist with timely determination of her ability to pay for services/treatment ordered by the court; submit to a psychological evaluation with IQ within 35 days as arranged by DHHS; have reasonable rights of agency-supervised visitation to be separate from Randy; timely notify the court of any services she deemed necessary to assist with the return of the children to the parental home; and timely notify her attorney if court-ordered services were not being timely provided. Following subsequent hearings, Terri was also ordered to complete a chemical dependency evaluation, submit to random drug testing, participate in therapy that addressed domestic violence, and complete a structured domestic violence program.

On August 30, 2021, the State filed a second supplemental petition wherein it alleged that Samson was within the meaning of § 43-247(3)(a) because he lacked proper parental care by the reason of the fault or habits of Terri in that:

- 2 -

A. Terri . . . currently has an open juvenile court case under [this same docket number] involving her other minor children.

B. Terri . . . has failed to make consistent progress with court orders under [this same docket number], and her minor children have remained in out-of-home care since February 5, 2020.

C. [Samson's] meconium test was positive for Fentanyl.

D. Terri['s] . . . use and/or possession of controlled substances places [Samson] at risk for harm.

E. Terri . . . is unable to provide proper parental care, support, and/or supervision for [Samson].

F. Due to the above allegations, [Samson] is at risk for harm.

That same day, the State filed an ex parte motion for immediate temporary custody of Samson, which the juvenile court granted. Samson was placed in foster care and has remained there since.

On October 19, 2021, Samson was adjudicated to be within the meaning of § 43-247(3)(a) based on Terri's admissions to the allegations in A, E, and F of the second supplemental petition. The allegations in B, C, and D were dismissed on the motion of the State. Terri's court-ordered requirements remained the same as previously ordered by the juvenile court. She was subsequently ordered to complete the Maternal Child Program.

On June 23, 2022, the State filed a motion to terminate Terri's parental rights to Serenity, Heavenly, Noah, Christian, and Samson, pursuant to Neb. Rev. Stat. § 43-292 (Reissue 2016). However, on October 5, the State filed a motion to dismiss its motion, and the juvenile court dismissed the motion the next day.

On October 7, 2022, the children's guardian ad litem (GAL) filed a motion to terminate Terri's parental rights to all five children pursuant to §§ 43-292(2) and (7). The record reflects that the State subsequently joined in the motion. It was alleged that: Terri substantially and continuously or repeatedly neglected and refused to give the children or a sibling necessary parental care and protection; the children had been in an out-of-home placement for 15 or more months of the most recent 22 months; and termination of Terri's parental rights was in the children's best interests.

On June 23, 2023, the children's GAL filed a motion requesting the juvenile court to appoint an additional GAL to represent some of the children due to their different needs and foster placements. The court granted the motion on July 11 and appointed an additional GAL to represent Heavenly, Noah, and Christian; the original GAL continued to represent Serenity and Samson. The newly appointed GAL subsequently gave notice that he was joining in the previously filed motion to terminate Terri's parental rights.

On September 20, 2023, the juvenile court ordered Terri to submit to random drug testing, which was to include nail clipping samples, by September 25. The court stated, "There shall be no restrictions placed upon [the] substances that might be detected." Terri did not cooperate in completing this testing.

On December 11, 2023, the GALs filed a joint ex parte motion to suspend Terri's visitation with the children, alleging that Terri had "avoided and refused to submit to [the required] drug testing for over 75 days as of the date of this motion." The motion included an affidavit from the

co-owner of Nebraska Drug and Alcohol Screening, who detailed her attempts to conduct the court-ordered drug testing on Terri. The juvenile court entered an ex parte order suspending Terri's visitation on December 11. Terri submitted to testing the next day. Following a hearing, the court entered an order on December 29, stating that Terri's visits were to remain suspended until her drug testing results were provided to the court and all counsel. The court further stated that if her results were negative, visits would resume. But if the results were positive for controlled substances, then the matter would be set for further hearing, and the court was "to be provided with a plan whereby visits [could] resume."

On January 5, 2024, the GALs filed a "Joint Motion and Notice of Hearing" alleging that the drug test results from December 12, 2023, showed that Terri tested positive for fentanyl and marijuana. The GALs requested that the juvenile court enter an order addressing Terri's visitation and appropriate restrictions. Following a hearing, the court entered an order on January 19 stating that "the order suspending visitation between [Terri] and [the] minor children shall remain in full force and effect and that once the parties have a firm visitation recommendation informed by therapists for the children, a plan shall be presented to the court for consideration." There is no evidence that a plan was presented to and/or approved by the court, and Terri's visitation remained suspended through the termination hearing.

### 2. TERMINATION HEARING

A hearing on the motion to terminate Terri's parental rights took place on March 15, 18, 20, and May 3, 2024. The State, the GALs, and DHHS participated in the hearing and will be collectively referred to as "the State." A privately retained attorney represented Terri during the first 3 days of the hearing. During those 3 days, the State presented evidence as to why Terri's parental rights should be terminated. At the close of the State's case on March 20, the juvenile court asked about evidence "from the mother." Terri's attorney responded that "we are going to have our client testify" but that it would "take quite some time," although it would "not take more than a half day for her testimony." Terri's attorney requested that they "not bifurcate" her testimony and "we're not going to get through it today." Therefore, counsel requested that they "begin with [Terri's] testimony on May 3rd."

(a) Change of Counsel and Motion to Continue

On May 1, 2024, Terri's first privately retained attorney, hereinafter referred to as "initial counsel," filed a "Withdrawal of Counsel." In support of his "Withdrawal of Counsel," he stated that Terri's second privately retained attorney, hereinafter referred to as "substitute counsel," had entered his appearance on behalf of Terri. Through discussions on the record between substitute counsel and the juvenile court on May 3, it appears that substitute counsel filed an entry of appearance and a motion to continue (without a supporting affidavit) on April 29. The actual filings are not contained in the record before us. Terri appeared at the May 3 termination hearing with substitute counsel, and initial counsel was not present.

Before the termination hearing began, the juvenile court addressed Terri's appearance with substitute counsel. It stated:

> [Court]: There is a counsel of record. There was a counsel of record. I don't see that there was ever a motion filed seeking leave to withdraw by prior counsel. Now, that may

- 4 -

ultimately be a moot issue because you have effectively entered your appearance with the pleading, but the concern of the Court is some of this could have been ironed out with the appropriate motion to withdraw, and that way everyone would know where they stand -- where they would stand on today's date, but that has not occurred. . . .

And then the other issue that I have is when -- because[,] with the motion to withdraw and representation that there would be successor counsel, the Court would have had the opportunity to advise whether or not it would be inclined to first grant the motion to withdraw and/or continue the matter . . . and another question is once one accepts or enters one's appearance, does not counsel take the case as it exists, meaning procedurally with all hearings set unless there's good cause to continue?

The following colloquy also took place:

[Court]: Do you take the case where it exists?

[Substitute Counsel]: Yes, Your Honor. And I would further state that I do believe there is good cause for a continuance in this matter.

. . . .

[Court]: You acknowledge that by filing your motion to continue, you have effectively entered your appearance?

[Substitute Counsel]: Actually, I entered an appearance prior to the motion to continue, Your Honor. And then it looks like on May 1st, [initial counsel] did enter a withdrawal of counsel.

[Court]: Where is that at? I was not --

[Substitute Counsel]: I have it as a filing date of May 1, 2024, at 3:58 p.m.

[Court]: Is there an order from the Court to withdraw?

[Substitute Counsel]: No, Your Honor, there's no order.

[Court] So filing the withdrawal doesn't -- does it really mean anything without an order?

[Substitute Counsel]: I think that, you know, as I have entered an appearance and I now am making an appearance in court --

[Court]: So it's a moot issue?

[Substitute Counsel]: Yes, Your Honor.

The juvenile court then addressed Terri's motion to continue. In support of the motion, Terri's substitute counsel stated that he was retained because Terri's initial counsel had not been communicating with her and, therefore, she did not feel like she "was getting adequate counsel in preparation for the [May 3, 2024, termination] hearing." He also stated that Terri reported making "multiple attempts" to contact her initial counsel since the March 20 hearing but did not get a response back until "she received an email earlier [that] week saying that . . . [he] had received the entry of appearance and [was] going to be filing a withdrawal of counsel."

Substitute counsel stated that he also had difficulty contacting Terri's initial counsel. He explained, "I've attempted to try and get the file from [initial counsel], and I have not gotten any response. Yesterday[,] I got a voicemail from him, which seemed to indicate that he did not believe he had ever represented [Terri], which struck me as odd." The following colloquy then took place:

[Substitute Counsel]: The voicemail that I received stated that [Terri] had been calling his former firm claiming to be a client or former client, and he didn't know what was going on. And I made, you know, multiple phone calls after that, after I received that voicemail and was not able to get a hold of him.

[Court]: And you're saying his message to you was that he has no recollection of her as a client?

[Substitute Counsel]: It was --

[Court]: Is that what you're telling me?

[Substitute Counsel]: His -- his message seemed ambiguous as to whether she was a client of his or not.

[Court]: What does that mean?

[Substitute Counsel]: He said -- because what it was was he said that she was calling his former firm saying she was a client, and he didn't know what was going on.

[Court]: So it's not that he didn't know her, but he did not know what was going on.

[Substitute Counsel]: Yes. And the tone of his voice seemed that he was confused by the name Terri [S.]

Substitute counsel also stated that he was not able to obtain a transcript of the 3 previous days of testimony for the termination hearing, as the court reporter advised him that it would not be ready until May 29. For these reasons, he argued that denying Terri's motion to continue would result in "serious due process concerns."

The juvenile court denied Terri's motion to continue. It reasoned:

[T]he bottom line for the Court here today is that good cause has not been shown, notwithstanding the fact that counsel has not exited the case in a manner set forth by law. One enters and accepts the risk. And without an order in advance or giving the Court the opportunity to weigh in, all assume the risk, including the mother.

### (b) Evidence Presented

The termination hearing proceeded, and Terri testified in her own behalf. She was not permitted to call any additional witnesses because her witness list was not timely filed by initial counsel and was therefore struck by the juvenile court. The following evidence was presented during the 4-day termination hearing.

### (i) 2015 Case

The juvenile court took judicial notice of Terri's involvement in a 2015 juvenile case. In that case, Serenity, Heavenly, and Noah, were removed from Terri's home and determined to be at risk of harm due to her drug use and the domestic violence between her and Randy, which occurred in the children's presence. Terri was ordered to participate in couples therapy and individual therapy and to complete a domestic violence program. The juvenile court's jurisdiction was terminated successfully in January 2018, when all the children were reunified with Terri and Randy.

Amanda Osborne, an initial assessment worker for DHHS, testified that from the time the children were reunified with Terri in 2018 until the start of this case, DHHS received approximately eight additional intakes concerning the children.

In September 2019, Osborne investigated a report that at the time of Christian's birth, he exhibited symptoms of drug withdrawal. When she interviewed Terri, Terri stated that she had prescriptions for oxycodone and Percocet but that she had not taken any of those medications throughout the duration of her pregnancy.

In November 2019, Osborne investigated another intake which reported that Serenity had been going door to door looking for food, that the children were not attending school, and that the children were frequently left unsupervised. In response, DHHS opened a voluntary case and offered services such as Intensive Family Preservation, family therapy, and individual therapy. Terri was also offered assistance in finding employment. Terri refused to participate in therapy, stating that it "did not work." As a result, the voluntary case was closed unsuccessfully.

Osborne became involved with the family again in December 2019, when she received an intake regarding further concerns of domestic violence and educational neglect. Terri informed Osborne that she would only accept DHHS's help if they paid her rent and ensured that she had a reliable form of transportation. When Osborne offered to arrange therapy for the children, Terri was not agreeable.

On January 28, 2020, DHHS received the intake that led to this case. The report once again outlined concerns of domestic violence and neglect of the children. At the time, Randy was incarcerated for charges of domestic violence and terroristic threats against Terri. Following an investigation into the matter, Osborne determined that the children would be at risk of harm if left in Terri and Randy's care. She based this determination on the family's prior intakes and concerns of domestic violence and drug use. As such, a plan was developed for the removal of the children.

The children were removed from Terri and Randy's home on February 5, 2020. Osborne was present for the removal and testified that the home "had a foul odor" and that "[t]here was trash everywhere." She stated,

> There were cracked eggs left open on the counter. There was dried food on top of the stove. There was a chair pulled up to the stove where the kids . . . were trying to get some of the food off of the stove. [And] [t]here was a bucket of dirty diapers sitting on the counter where there had been obvious signs that food was being prepared.

Osborne also testified that none of the children had coats, and that Terri was unable to find shoes for Noah. In addition, Christian was in a "soiled diaper" that had "soaked through." Terri did not have any diapers but stated that she was planning to get some later that day.

Osborne testified that DHHS received three additional intakes concerning the abuse and neglect of Terri's children throughout this case.

Cindy Johnson, Betsy Miller, and Brittney Long, were case supervisors at various points throughout Terri's case, and Andrea Aguirre was Terri's case manager from August 2020 to April 2021.

Johnson was assigned to supervise Terri's case from February 2020 to August 2020 and again from April 2021 through the fall of 2021. Johnson has completed extensive training on domestic violence issues and has handled more than 1,000 juvenile court cases. She testified about the impact of domestic violence between parents on their children. She explained:

> [I]t impacts reunification as both partners need to work through . . . addressing the domestic violence that's happening within their relationship. It also impacts the children. The children sometimes are there witnessing domestic violence, and that impacts their all over well-being and safety. And also at times they may actually become involved in the assault.

When Johnson took over Terri's case, she identified several issues that Terri needed to address, including the long history of domestic violence between her and Randy. Johnson testified that as of July 2021, none of the children could be safely placed with Terri because she and Randy continued to live together and had failed to address the problems that led to the children's removal. Johnson testified that Terri needed to take responsibility for the domestic violence that had occurred rather than "sweep it under the rug." Although Terri completed a structured domestic violence program, Johnson stated that she never acknowledged the effect the domestic violence had on the emotional and physical well-being of her children.

Miller was assigned to supervise Terri's case from August 2020 to April 2021, and again from the fall of 2021 to November 2022. Miller testified that the continuing instability in Terri's relationship with Randy made it nearly impossible for DHHS to develop a realistic reunification plan. Miller emphasized that DHHS prioritized domestic violence services for both parents because of their long, harmful history. However, the situation continued to fluctuate, with Randy frequently moving in and out of the home. According to Miller, Terri wavered between saying she wanted to end her relationship with Randy and then expressing uncertainty about doing so. Over the span of 2½ years, Terri repeatedly assured DHHS that she wanted to separate from Randy but took no steps toward that goal.

Miller also testified that in June 2022, she called the CPS Hotline regarding a serious safety concern at Terri and Randy's home. A report had been made that Randy had physically assaulted Gabriel, who had been previously reunified with Terri during this case. Miller went to the home and met with Gabriel and Terri. She observed that Gabriel was visibly upset and had been crying. She advised Terri that if she could not keep Randy away from Gabriel, DHHS would have no choice but to remove Gabriel from her care again.

Throughout most of this case, the juvenile court prohibited Randy from being present at Terri's supervised visits with the children. Nevertheless, case manager Aguirre testified that in April 2021, Randy was present in the home when the children arrived for a visit -- just before Terri herself arrived. Similarly, Miller testified that she received numerous reports during her involvement in the case indicating that Terri was allowing Randy to be present during visits with the children, despite court orders prohibiting his involvement. In November 2022, the court ordered that Terri's visits with her children be moved from her home to a neutral location with all children physically situated in one common area. This decision was made because the visitation supervisors were unable to maintain line-of-sight supervision of each child during the visits, and Terri was allowing the children to use her phone to communicate with Randy.

From September 2020 to September 2023, the juvenile court issued orders requiring Terri to participate in therapy to address the domestic violence in her relationship with Randy. The orders required her to make "sustained material progress" in therapy. Despite these orders, Terri's case managers and supervisors testified that they never received documentation that she completed therapy or made material progress.

Megan Heinke, a mental health practitioner, began providing individual therapy to Heavenly in September 2023. She testified that Heavenly has been diagnosed with ADHD, PTSD, and adjustment disorder. She stated that during therapy, Heavenly discussed two domestic violence incidents between her parents. Heavenly described one incident where her dad "push[ed] her mom against the wall" and another where her dad "hit [her] mom." Finally, Heinke testified that at the time of trial, Heavenly was not ready to participate in therapy with Terri. She explained that Heavenly would need to be more willing to discuss her trauma before that step could be taken. She also explained that she would only bring Terri into therapy on Heavenly's terms.

Evidence was also provided regarding Terri's drug use. Like Christian, Samson exhibited withdrawal symptoms after birth. Lisa Devall, a nurse practitioner, provided care for Samson following his birth in 2021. She helped treat the withdrawal symptoms he experienced as a result of being born with fentanyl in his system. She testified that Samson was diagnosed with neonatal abstinence syndrome and displayed symptoms of jitteriness, irritability, high respiratory rates, poor feeding, and poor weight gain. Nonpharmaceutical treatments were ineffective, so morphine was required to manage his symptoms until he could be safely discharged from the hospital. According to Devall, giving morphine to newborns is dangerous because they can become addicted to it, and large doses may cause harm, potentially resulting in death.

When Devall first interviewed Terri, she denied taking any medications during her pregnancy with Samson. However, during the second interview, Terri admitted to having a prescription for Percocet, which contains oxycodone and acetaminophen. She also reported taking Zofran. She claimed to have stopped all medications 1 to 2 months before giving birth but admitted that she took Percocet on the day of Samson's delivery. Devall testified that Percocet and fentanyl are both opioids, but they are different substances, and fentanyl is more potent. She further noted that taking Percocet would not result in a positive test result for fentanyl. Additionally, she stated that environmental exposure would not have caused Samson to test positive for fentanyl. In other words, Terri had to have ingested the drug.

Terri was asked to submit to a urine drug test to assist in the treatment of Samson's withdrawal symptoms. Devall testified that a drug test would have helped identify which opioid Samson had been exposed to and how recent the exposure was. She emphasized the importance of the test to Terri. However, Terri refused to take it and did not provide an explanation for her refusal. Devall stated that Samson would need to be monitored throughout his life because of his exposure to fentanyl.

Johnson testified that she confronted Terri about the fentanyl in Samson's system because she was concerned that Terri was displaying a lack of accountability regarding how the drug got into Samson's system. However, when she told Terri that she needed to take ownership of the presence of fentanyl in Samson's system, Terri changed the subject.

In September 2023, the juvenile court ordered Terri to undergo fingernail drug testing. Shana Clapper, the co-owner of Nebraska Drug and Alcohol Screening, administered Terri's

court-ordered fingernail drug test. She explained that a fingernail drug test can detect drug use within the past 6 months. Clapper provided a record detailing her numerous attempts to perform the drug test on Terri. Osborne began contacting Terri on October 2, but Terri did not submit to the drug test until December 12. Clapper described the detailed protocol she followed to collect Terri's fingernail clippings and submit them to the laboratory for analysis.

James Bourland is the director of ExperTox, the laboratory that conducted the analysis for Terri's fingernail drug test. His deposition was received into evidence as exhibit 196 in lieu of live testimony at the termination hearing. During Bourland's deposition, Terri's drug test results were offered into evidence as exhibit 4A. The drug test results show that Terri tested positive for fentanyl and marijuana on December 12, 2023. Bourland testified that he could say "to a reasonable degree of certainty" that the results were accurate. He also stated that the results indicated that the positive fentanyl test was not the result of environmental exposure, and that Terri had to have ingested the drug. Finally, Bourland testified that the concentration of fentanyl in Terri's results was among the top 5 percent of positive hair and nail fentanyl tests he has reviewed in total and was the highest concentration among the 13 positive nail tests he reviewed in 2023.

After Terri submitted to the fingernail drug test, Clapper continued to administer 14-panel drug tests on Terri using urine samples. Clapper explained that a 14-panel drug test can detect opioids, while an 8-panel test cannot. She testified that on February 29, 2024, Terri intentionally contaminated her urine sample by sticking her thumb into the specimen and spilling it onto her leg and the floor. Additionally, on March 10, Terri failed to submit to drug testing. She did not respond to Clapper's text requesting her to test that morning and failed to answer the door when Clapper arrived at her residence, knocked, and waited 19 minutes.

From the beginning of this case in February 2020, until December 2023, Terri's visits were arranged so that she saw some children on one day and others on a different day. This arrangement was not ordered by the juvenile court or DHHS but was made at Terri's specific request. Testimony from case managers and supervisors confirmed that Terri struggled to manage all of her children together in a single visit. Reports consistently described her visits as chaotic, even when multiple supervisors were there to assist her.

In December 2023, Terri's visits were suspended by the juvenile court after she evaded the court-ordered fingernail drug testing. The court stated that her visits could resume if she produced a negative drug test. However, as noted previously, she tested positive for fentanyl. In January 2024, supervisor Long proposed a plan to reinstate Terri's visits, recommending that Terri complete an updated chemical dependency evaluation and follow recommendations from that evaluation. The court rejected Long's plan and chose to wait for input from the children's therapists. According to Long, Terri had made no requests to reinstate her visits since December 2023.

As part of Terri's case plan, she was required to maintain a legal and stable source of income, to provide proof of that income to DHHS, and to submit timely budgets. Miller testified that in the event that Terri did separate from her husband, DHHS needed assurance that she had a reliable plan to financially support both herself and her children before reunification could be considered. Although there was evidence that Terri worked sporadically, none of the DHHS workers were able to confirm that she consistently maintained lawful employment. They also stated that she did not regularly provide proof of income. Miller reported that by the end of her

time on the case in late 2022, she had not received a budget or consistent documentation from Terri establishing that she was employed or financially self-sufficient. Long similarly testified that Terri was uncooperative when asked to provide a budget and proof of income; the last time Terri submitted proof of income was in June 2023. Over the following year and a half, Terri provided just one single budget in October 2023, and even then, it was not accompanied by any proof of income. At the time of the termination hearing, Terri had not submitted an updated budget or proof of income to DHHS. Long explained that this ongoing failure to provide documentation created a substantial barrier to reunification, as DHHS could not conclude that Terri had the financial means to provide for the needs of her children.

Long opined that, based on the length of time the children had been in care and Terri's lack of progress, it would be in the children's best interests to terminate Terri's parental rights.

When Terri testified, she asserted that she had complied with all the juvenile court's orders and blamed the case professionals for failing to help her achieve reunification with her children.

### 3. Juvenile Court's Decision

On June 11, 2024, the juvenile court entered an order terminating Terri's parental rights to Serenity, Heavenly, Noah, Christian, and Samson after finding that statutory grounds for termination existed pursuant to § 43-292(2) and (7), and that termination of Terri's parental rights was in the children's best interests.

Terri appeals.

## III. ASSIGNMENTS OF ERROR

Terri assigns, restated, that the juvenile court erred in (1) allowing her initial counsel to withdraw; (2) not granting a continuance of the May 3, 2024, termination hearing; (3) admitting exhibit 196 (Bourland's deposition) into evidence; and (4) finding that the termination of her parental rights was in her children's best interests.

## IV. STANDARD OF REVIEW

A court's grant or denial of a continuance is within the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020).

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

### 1. Withdrawal of Initial Counsel

Terri contends that the juvenile court "erred in allowing [her initial counsel] to withdraw." Brief for appellant at 9. The State argues that initial counsel "never properly withdrew from representing [Terri] in the case and therefore, [substitute counsel's] entry into the case was, ostensibly, in the capacity as a co-counsel for [Terri]." Brief for appellees at 35.

We agree with the State that initial counsel had not properly requested to withdraw from the case when the final day of hearing commenced on May 3, 2024. Further, the juvenile court did not enter an order granting such a request at the time of the hearing. Instead, the juvenile court pointed out that initial counsel's "filing the withdrawal" did not "really mean anything without an order." Notably, Neb. Ct. R. § 6-1706(D) (rev. 2022) of the Uniform Separate Juvenile Court Rules of Practice and Procedure states, in relevant part:

> (1) The authority of the attorney shall commence upon appointment or entry of appearance by retained counsel, and shall continue until such time as the court terminates its jurisdiction, or there are no scheduled review hearings in court, or the court otherwise discharges the attorney.

> (2) An attorney may withdraw from representation when the attorney files a motion to withdraw, and the court, in its discretion, enters a corresponding order granting such withdrawal. Termination of representation may only be sought or granted if it is in compliance with Neb. Ct. R. § 3-501.16.

Under Neb. Ct. R. of Prof. Cond. § 3-501.16(b), a lawyer may withdraw from representing a client only if the lawyer offers a specified reason for withdrawal and shows that he has complied with notice laws or obtained the court's permission to terminate the representation. A lawyer must "take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client [and] allowing time for employment of other counsel." § 3-501.16(d). A court should consider whether withdrawal could be accomplished without a material adverse effect on the client's interests. See § 3-501.16(b)(1).

In this case, Terri's initial counsel did not properly withdraw from representing Terri. While he filed a "Withdrawal of Counsel" on May 1, 2024, he did not file a motion to withdraw, set the matter for a hearing, or provide proof of service to opposing counsel and Terri. He also did not obtain a court order approving his withdrawal. As such, there could be no error by the juvenile court regarding initial counsel's attempt to unilaterally withdraw.

## 2. CONTINUANCE

Terri contends that because of initial counsel's lack of compliance with juvenile court rules and ethical rules regarding withdrawing from the case, the juvenile court erred in not granting her motion to continue the May 3, 2024, hearing. She argues that denying her motion to continue "left her effectively without adequate counsel" for that hearing, "and as such did not respect the parent's due process rights to representation by an attorney." Brief for appellant at 11. We disagree that Terri's due process rights were violated.

Because of a natural parent's fundamental liberty interest in the care, custody, and management of their child, if the State intervenes to adjudicate a child or terminate the parent-child relationship, its procedures must meet the requisites of the Due Process Clause. *In re Interest of Landon H.*, 287 Neb. 105, 841 N.W.2d 369 (2013). A juvenile court order that terminates parental rights through procedures that violate the parent's due process rights is void. *Id.*

Procedural due process requires notice to the person whose right is affected by the proceeding; reasonable opportunity to refute or defend against the charge or accusation; reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge

or accusation; representation by counsel, when such representation is required by the Constitution or statutes; and a hearing before an impartial decisionmaker. *Id.*

We first note that an application for a continuance must be in writing and supported by an affidavit which contains factual allegations demonstrating good cause or sufficient reason necessitating postponement of the proceedings. Neb. Rev. Stat. § 25-1148 (Reissue 2016). An oral request is not sufficient to comply with this requirement. See *Gutierrez v. Gutierrez*, 5 Neb. App. 205, 557 N.W.2d 44 (1996) (denying wife's request for continuance on basis that it was merely oral and holding that application for continuance must be in writing and supported by affidavit which contains factual allegations demonstrating good cause or sufficient reason necessitating postponement of proceedings; oral request is insufficient). Failure to comply with § 25-1148 is relevant as to whether the trial court abused its discretion in denying a motion to continue. See *State v. Perez*, 235 Neb. 796, 457 N.W.2d 448 (1990).

In this case, Terri's motion to continue is not in our record. However, based upon discussions on the record between substitute counsel and the juvenile court, it appears that a motion was filed on April 29, 2024, without a supporting affidavit. Although the motion to continue is not contained in the record on appeal, we will nevertheless consider Terri's due process argument based upon the record before us.

The record reflects that Terri had notice of the May 3, 2024, termination hearing and was represented by substitute counsel who agreed on the record that he "[took] the case where it exist[ed]." Terri was afforded a reasonable opportunity to present a defense and to confront and cross-examine adverse witnesses. There were many weeks between the March 20 hearing, at which time the State had concluded its case, and the final May 3 hearing date. Notably, initial counsel informed the juvenile court on March 20 that the only evidence anticipated for the May 3 hearing was Terri's testimony and it would "not take more than a half day." To the extent new counsel was desired by Terri to lead her through her testimony, there was ample time to obtain new counsel and prepare for the May 3 hearing.

Further, Terri has failed to demonstrate how she was prejudiced by the juvenile court's denial of her motion to continue. See *State v. Parnell*, 294 Neb. 551, 571, 883 N.W.2d 652, 668 (2016) ("[T]here is no abuse of discretion by the court in denying a continuance unless it clearly appears that the party seeking the continuance suffered prejudice as a result of that denial."). She argues that she was "effectively [left] without adequate counsel," brief for appellant at 11, but fails to identify any specific harm she suffered. As discussed above, the only anticipated evidence to be offered on Terri's behalf was her own testimony. Our review of the record shows that substitute counsel asked Terri numerous questions related to her interactions with case workers and others involved in her case, as well as her view of her progress with various services and programs. She was provided with a reasonable opportunity before an impartial decisionmaker to refute or defend the allegations against her.

We conclude that the juvenile court acted within its discretion in declining to delay the proceedings under these circumstances.

- 13 -

### 3. EXHIBIT 196--BOURLAND'S DEPOSITION

As noted previously, Bourland is the director of ExperTox, the laboratory that conducted the analysis for Terri's fingernail drug test. His deposition was received into evidence as exhibit 196 in lieu of live testimony at the termination hearing.

Terri contends that the juvenile court erred in "admitting exhibit 196 and considering it with respect to the motion to terminate [her parental] rights." Brief for appellant at 11. She argues that "there is no evidence that the Juvenile Court conducted a due process analysis of the exhibit prior to admitting it and considering it, and as such, the admission of that exhibit was in error." *Id*. She claims the juvenile court "did not make any further rulings on objections raised within the exhibit." *Id*. The State argues that Terri "fails to describe how her due process rights were violated" and that the court "did consider and overruled" each of Terri's objections in orders entered in March 2024. Brief for appellee at 29. We agree with the State.

On January 4, 2024, the GALs filed a joint motion to take Bourland's deposition remotely and to use it as substantive evidence at Terri's termination hearing. The juvenile court entered an order granting the motion on January 19 and stated that Bourland's deposition "shall be used as substantive evidence on the motion to terminate [Terri's] parental rights." According to the court's order, no objections were made to the motion. The deposition took place on February 21, after proper notice was provided to all parties. All parties were present, including Terri's initial counsel.

Bourland testified that he has a Ph.D. in pharmacology and toxicology and that he has been a laboratory director for over 20 years. He explained that in his role as director, he oversees all individuals who work directly in the laboratory, as well as those who report to him indirectly. He further explained that during each of his visits to the facility, he conducts inspections and audits to ensure that the laboratory remains in compliance with applicable rules and regulations. He stated that ExperTox is an accredited laboratory.

Bourland also testified about the procedures ExperTox follows when receiving and analyzing a specimen for drug testing. Regarding this case, he stated that although he did not personally analyze Terri's fingernail clippings, he "wrote the procedures and everything that dictate[s] what the analyst does." He also reviewed Terri's drug test records. Bourland stated that Terri's clippings would not have been tested unless they were received in a secure condition and had the correct identifiers. Additionally, he had no reason to believe that ExperTox's testing protocols and procedures had not been followed in this case.

During Bourland's deposition, Terri's drug test results were offered into evidence as exhibit 4A. Terri's counsel raised objections to the exhibit based on form, foundation, and hearsay. The drug test results show that Terri tested positive for fentanyl and marijuana on December 12, 2023. Bourland testified that he could say "to a reasonable degree of certainty" that the results were accurate. He also stated that the results indicated that the positive fentanyl test was not the result of environmental exposure, and that Terri had to have ingested the drug. Finally, Bourland testified that the concentration of fentanyl in Terri's results was among the top 5 percent of positive hair and nail fentanyl tests he has reviewed in total and was the highest concentration among the 13 positive nail tests he reviewed in 2023.

Terri's initial counsel cross-examined Bourland, and the following colloquy took place:

[Initial Counsel]: In regard to [Terri's specimen], you have no independent knowledge of these test results other than what you reviewed through data -- raw data collection?

[Bourland]: Other than what I reviewed through chain of custody, raw data collection forms, all the -- all the equivalent of a litigation packet, no, I don't have an independent recollection of that or observation.

It was all reviewing the report and also understanding what our laboratory does on a day-to-day basis and following the standard operating procedures in the lab.

[Initial Counsel]: And you're making the assumption that your accessioners, testers, followed standard procedures[,] correct?

[Bourland]: That's correct.

On March 14, 2024, Terri's initial counsel filed a motion requesting a *Daubert/Schafersman* hearing regarding her drug test results. The juvenile court addressed the motion on March 15. It overruled the motion, stating that the *Daubert/Schafersman* standards are "limited to those cases in which the rules of evidence apply, and the Nebraska [R]ules of [E]vidence [do not apply] in cases involving [the] termination of parental rights."

At the March 18, 2024, termination hearing, Bourland's deposition was offered into evidence as exhibit 196. Terri's initial counsel objected to its admission on foundation and hearsay grounds. The juvenile court took the matter under advisement and entered an "Order on Objections to Exhibit 196." Although the order was dated March 20, 2024, it was not filed stamped until March 27. The court found that Bourland was unavailable to testify in person and it made specific findings on Terri's objections to the deposition testimony. The court also stated that exhibit 196 "shall be received inclusive of deposition exhibits 1A, 2A, and 3A[,] all as supplemented by the addendum to the deposition set forth in exhibit 197." On May 29, the court entered an "ORDER NUNC PRO TUNC RE ORDER ON OBJECTIONS TO EXHIBIT 196." It stated, "The court finds that through inadvertence and oversight, the court's order dated March 20, 2024, regarding objections to exhibit 196 . . . fails to include that exhibit 4A is also received." The court therefore corrected its March 20 (file-stamped March 27) order "to reflect that [exhibit 196] shall be received inclusive of deposition exhibits 1A, 2A, 3A, and 4A[,] all as supplemented by the addendum to the deposition set forth in exhibit 197."

In termination of parental rights hearings, the Nebraska Evidence Rules do not apply and, thus, neither do the *Daubert/Schafersman* standards. See *In re Interest of Rebecka P.*, 266 Neb. 869, 669 N.W.2d 658 (2003). Instead, due process controls and requires that fundamentally fair procedures be used by the State in an attempt to prove that a parent's rights to his or her child should be terminated. *Id.*

In *In re Interest of Rebecka P., supra*, the Nebraska Supreme Court determined that the father's due process rights were not violated by the admission of deposition testimony because the father received notice of the termination hearing, appeared at the hearing, and was represented by counsel. In addition, the record reflected that during the deposition, his counsel cross-examined the witness and raised several objections to the witness' testimony. The same is true in the present case.

The record reflects that Terri received proper notice of the termination hearing and that during the termination hearing, she appeared and was represented by counsel. With regard to Bourland's testimony, the record reflects that Terri's initial counsel was present at the deposition and cross-examined Bourland on Terri's behalf. He also raised several objections during the deposition, including an objection to Terri's fingernail drug test results contained in exhibit 4A. Terri argues that her due process rights were violated because the juvenile court failed to rule on the objections she made during Bourland's deposition. However, our record reflects that the court issued a written order on March 27, 2024, where it made specific findings on Terri's objections to the deposition testimony and exhibits. The court also entered an order nunc pro tunc on May 29 where it corrected its March 27 order to include exhibit 4A.

We conclude that Terri was afforded due process with respect to the receipt of Bourland's deposition testimony.

4. TERMINATION OF PARENTAL RIGHTS

Finally, Terri contends that the juvenile court erred in finding that the termination of her parental rights was in her children's best interests. Terri does not challenge the court's findings of statutory grounds for termination of her parental rights to the children, however, for the sake of completeness, we briefly review the court's findings.

(a) Statutory Grounds for Termination

The State sought to terminate Terri's parental rights to the children under § 43-292(2) and (7). The juvenile court found, by clear and convincing evidence, that both grounds for termination existed.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." The existence of the statutory basis alleged under § 43-292(7) should be determined as of the date the petition or motion to terminate is filed. *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*. In other words, if the 15-out-of-22 months' period is met, § 43-292(7) is met. *See In re Interest of Mateo L. et al., supra*.

Serenity, Heavenly, Noah, and Christian, were removed from Terri's custody in February 2020, and they remained in foster care thereafter. Samson was removed from Terri's custody in August 2021, and he remained in foster care thereafter. By the time the motion to terminate Terri's parental rights was filed on October 7, 2022, Serenity, Heavenly, Noah, and Christian, had been in an out-of-home placement for 32 months, thus the 15-out-of-22 months' period was clearly satisfied for them. However, Samson had only been in an out-of-home placement for 13 months, thus the 15-out-of-22 months' period was not satisfied for him. Accordingly, we must look to the other alleged statutory basis to support the termination of Terri's parental rights to Samson.

Section 43-292(2) provides for termination of parental rights when the parent has substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling

of the juvenile necessary parental care and protection. "One need not have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2)." *In re Interest of Joseph S. et al.*, 291 Neb. 953, 961, 870 N.W.2d 141, 148 (2015). "'"A parent may as surely neglect a child of whom [he or] she does not have possession by failing to put [himself or] herself in a position to acquire possession as by not properly caring for a child of whom [he or] she does have possession."'" *In re Interest of Elizabeth S.*, 282 Neb. 1015, 1025-26, 809 N.W.2d 495, 504 (2012) (citations omitted) (brackets in original).

The older children were removed from Terri's parental care due, in part, to concerns about her drug use. When Samson was born in August 2021, his meconium tested positive for fentanyl. Terri subsequently failed to comply with court-ordered drug testing, resulting in the suspension of her visitation on December 11, 2023. Her December 12 drug test was positive for fentanyl and marijuana. Terri's visits remained suspended at the time of the termination hearing. By her own actions and choices, Terri failed to put herself in a position to acquire possession of Samson (and the older children). See *In re Interest of Elizabeth S., supra*.

The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating Terri's parental rights to Serenity, Heavenly, Noah, and Christian, and § 43-292(2) exists as a statutory basis for terminating Terri's parental rights to Samson. We next consider whether termination is in the children's best interests.

(b) Best Interests

Under § 43-292, in addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, Serenity, Heavenly, and Noah, were removed from Terri and Randy's home in 2015, based in part on the ongoing domestic violence between them, which occurred in the children's presence. Although the children were reunified with their parents in 2018, they were removed once again in 2020 in the present case, also due in part to the ongoing domestic violence between Terri and Randy; Christian was also removed in 2020. DHHS never received documentation showing that Terri completed therapy addressing domestic violence or made material progress in such therapy. Additionally, Samson was born with fentanyl in his system in

- 17 -

2021. In December 2023, Terri finally submitted to a nail clipping drug test, and once again tested positive for fentanyl. She continued to be noncompliant with drug testing through March 2024.

In addition to the issues noted above, the record reflects that Terri had difficulty exercising visitation with all her children at the same time, and the visits were chaotic. Her visits were suspended in December 2023 and remained suspended at the time of the termination hearing in March and May 2024. By the time of the termination hearing, Serenity, Heavenly, Noah, and Christian had been in out-of-home placement for over 4 years. Samson had been in an out-of-home placement for his entire life, more than 2½ years. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). The children deserve permanency. And when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the children's best interests require termination of parental rights. See *In re Interest of Leyton C. & Landyn C., supra*. The State proved that Terri was unfit, meaning that she has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the children's well-being. See *Id.* We further find that there is clear and convincing evidence that it is in the children's best interests to terminate Terri's parental rights.

## VI. CONCLUSION

For the foregoing reasons, we affirm the order of the juvenile court terminating Terri's parental rights to Serenity, Heavenly, Noah, Christian, and Samson.

AFFIRMED.